## Augustus S. Peabody, Appellant, v. Sanitary District of Chicago, Walter E. Schmidt, Treasurer, and Illinois Improvement & Ballast Company, Appellees.

## Gen. No. 28,757.

1. APPEAL AND ERROR—*urging moot question on appeal.* Where, at the time a bill was filed to restrain the Sanitary District of Chicago from making further payments to the corporation to which a sewer contract was let and to require such corporation to show what it was actually entitled to for work done on the basis of a *quantum meruit*, the work was 90 per cent completed and was completed pending the hearing and it is not contended that the work was not properly done, the question whether the contracting corporation was a responsible bidder is a moot question and may not be urged as a reason for declaring the contract void or for avoiding the payments called for by its terms.

2. PUBLIC CONTRACTS—*when agreement between prospective bidders not objectionable as tending to suppress bidding.* A statement made by the president of a corporation submitting a bid on a sewer contract in an affidavit that the bid is made "without agreement, understanding or combination, either directly or indirectly, with any other person or persons, with reference to such bidding in any way or manner whatsoever," *held* to mean, when read in connection with the balance of the affidavit, that the affiant had done nothing to stifle bids or interfere with anyone who might otherwise have submitted a bid and was not contrary to an agreement between affiant and a construction company that if the bid should be accepted the latter would do the actual work, where the evidence showed that such construction company had not sufficient financial strength to undertake the contract alone and would not have submitted a bid had the agreement not been made.

3. PUBLIC CONTRACTS—*construction of specifications for sewer construction.* A provision in sewer specifications that all timbering used in tunnel and shafts shall be left in place "unless removed by permission of the engineer" is not in conflict with another provision that all timbering left in place "by order of the engineer as herein specified" will be paid for at the prices specified and when construed with the latter provision does not mean that all timbering not removed by permission of the engineer shall be at the expense of the contractor.

4. PUBLIC CONTRACTS—*construction of proposal for bids on public*

266    APPELLATE COURTS OF ILLINOIS.

Peabody v. Sanitary Dist. of Chicago et al., 235 Ill. App. 265.

*contract.* In determining if timbering left in place in the construction on order of the engineer was to be paid for or to be at the expense of the contractor, no significance is to be attached to the fact that the proposal asked for bids on 100 cubic yards of excavation and 100 cubic yards of additional concrete and 50,000 feet, board measure, of sheeting or timbering where such quantities were not the quantities contemplated in the execution of the contract but on the contrary the specifications distinctly provided that such quantities were specified solely for the purpose of comparing bids.

5. PUBLIC CONTRACTS—*right to compensation for extra work.* In a suit involving the validity of payments for extras under a sewer construction contract, *held* that when the engineer of the Sanitary District of Chicago directed that, because of a difference in soil conditions encountered from those contemplated, the tunnel be timbered and that all timbering be left in place and submitted to the contractor, revised cross sections indicating that specified amounts of "extra excavation," "extra timbering" and "extra concrete" were involved, a change of plan was effected involving additional payment for such extras.

6. EVIDENCE—*probative weight of opinion evidence.* The testimony of engineers as to what they would have bid had they been bidding on a certain sewer contract, given in a suit involving the payment for certain extras after completion of the contract, is of little real value.

7. OFFICERS AND PUBLIC EMPLOYEES—*treasurer of Sanitary District an officer within prohibition against interest in public contract.* The treasurer of the Sanitary District of Chicago is the holder of an office by appointment within the meaning of Cahill's Ill. St. ch. 102, ¶ 3, making it unlawful for any person holding such an office to become interested in any contract or the performance of any work in the making of which he may be called upon to act or vote.

8. PUBLIC CONTRACTS—*invalidity of contract for personal interest of officer.* The treasurer of the Sanitary District of Chicago, among whose duties is the selection of depositaries for all of the funds of the district, the advising of the district on financial matters and the making of such reports as are required, is not merely a ministerial officer, and the facts that he was the president of a bank which might be used as a depositary of funds of the district; that he was vice president of and a large stockholder in a corporation which was the successful bidder on a large sewer contract for the district, which corporation made its bid with the understanding with another corporation that was being financed by the bank that it was to do the actual construction work on

which the corporation of which he was vice president would receive a share of the profits; that under such relationships he might indirectly use the funds of the district to finance the construction work; and that he might be called upon to advise the district as to the financial responsibility of the bidders for the contract; were sufficient to render the contract for the construction of the sewer void under Cahill's Ill. St. ch. 102, ¶ 3, and to require an accounting for the money received for construction of the sewer with a view to adjusting the compensation therefor on the basis of a *quantum meruit*.

O'CONNOR, P. J., dissenting.

Appeal by plaintiff from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1923. Reversed and remanded with directions. Opinion filed December 24, 1924. Rehearing denied January 6, 1925.

WALTER F. DODD and JOHN H. BISHOP, for appellant.

CLYDE L. DAY, for appellees Sanitary Dist. of Chicago and Walter E. Schmidt, treasurer; HECTOR A. BROUILLET and WARWICK A. SHAW, of counsel.

McCORMICK, KIRKLAND, PATTERSON & FLEMING and MAYER, MEYER, AUSTRIAN & PLATT, for appellee Illinois Improvement & Ballast Co.; WEYMOUTH KIRKLAND and FREDERIC BURNHAM, of counsel.

MR. JUSTICE THOMSON delivered the opinion of the court.

This is an appeal by the complainant Peabody, from a decree of the superior court of Cook county, dismissing his bill for want of equity. The defendant Sanitary District of Chicago had let a contract for the building of a sewer to the defendant Illinois Improvement & Ballast Company. At the time the complainant filed his bill, the work to be done under this contract had been completed to the extent of about 90 per cent and of the amounts to be paid the contractor

under the contract (amounting to $2,407,216.64, including the so-called extra items) something in the neighborhood of $500,000 remained unpaid. By his bill the complainant prayed that the Sanitary District be restrained from making any further payments to the Illinois Improvement & Ballast Company, and that an accounting be ordered, at which the company should be required to show what it would be entitled to receive for the work done under the contract on the basis of a *quantum meruit* and that it be required to return to the Sanitary District, for the benefit of the complainant and all other taxpayers, whatever amounts it had received over and above that sum.

The Illinois Improvement & Ballast Company, to which we shall hereafter refer as the Ballast Company, was a corporation which had been engaged in the contracting business. Emil G. Seip was the president of that company and Walter E. Schmidt was its vice president and the owner of 1,200 of the 5,000 shares of its capital stock. In 1919 the Ballast Company disposed of all its plant and equipment and of all its contracts and accounts payable on account of operations subsequent to May 1 of that year, together with the good will and all property rights of every kind and character owned by the Ballast Company, to a newly organized corporation known as the Illinois Improvement & Construction Company, to which we shall hereafter refer as the Construction Company, for which the Ballast Company received all the capital stock of the Construction Company and since that time the Construction Company has apparently been a subsidiary of the Ballast Company, both companies having the same officers. Seip testified that the object in organizing the Construction Company was to separate the contracting business from the other business that the Ballast Company had, and for that reason the latter turned over all its contracts and equipment to the Construction Company; that the

Ballast Company was a holding company and held bank stocks and corporate stocks of various corporations to the value of about $1,000,000; that the Construction Company was organized for the purpose of taking over the construction work of the Ballast Company,—"our desire was to separate it from the banking and investment work. * * * Mr. Schmidt handled the banking and investment end of it."

Schmidt was also the president of the Roseland State Bank. One of the regular customers of that bank was the Byrne Brothers Construction Company, a concern which was also engaged in the contracting business, to which we shall hereafter refer, as Byrne Brothers. As to this concern, Schmidt testified, "Our bank relations with Byrne Brothers always have been satisfactory. They are regarded as financially responsible by our bank."

In January, 1921, Schmidt became treasurer of the Sanitary District of Chicago by appointment of the trustees of the district. Section 25 of the rules of the district prescribes the duties of the treasurer, which are, in part, that he "shall receive all moneys of the Sanitary District of Chicago and make such payments as shall be ordered by the Board upon warrants signed by the chairman of the committee on finance and the clerk," and shall "sign all warrants and checks drawn for account of the Sanitary District of Chicago" and "shall make all payments of principal and interest on bonds issued by the Sanitary District of Chicago, when due," and "shall make such reports as are required and act as the financial adviser of the Board of Trustees." It is also provided by this rule that "the selection of depositaries for the funds of the Sanitary District of Chicago in the hands of the treasurer, shall be entirely in the control of said treasurer." Schmidt testified that the only financial matter the board ever consulted him about was "as to the market value of bonds at four per cent or four and a half per cent,

whatever they may think of issuing,—about what the market is.''

Under date of November 7, 1921, the Sanitary District issued proposals for the ''North Side Intercepting Sewer, Contract No. 1.'' Early in that month and, according to the testimony of Seip, prior to the date these proposals were issued, he had a talk with one of the Byrnes about the doing of the work of constructing this sewer, although he testified that at this time he only knew of this contract of the north side sewer in a general way. Two days after the Sanitary District issued its proposals for the contract referred to, namely, on November 9, 1921, Seip, personally, entered into a contract with Byrne Brothers reciting that the latter were desirous of constructing certain work for the Sanitary District of Chicago, known as ''Contract No. 1,'' for the North Side Intercepting Sewer, and that they desired Seip to finance that work. Following this, the contract provided that ''said work, if secured, is to be contracted for in the name of The Illinois Improvement and Ballast Company'' and that the work was to be done by Byrne Brothers and that all the money was to be collected by the Ballast Company and that the latter would pay Byrne Brothers ''all such money that they may need from time to time to carry on said work out of the money received from the Sanitary District and upon the completion of the work and final payment therefor said Ballast Company will pay the balance of the money received by it from the said District'' to Byrne Brothers. This contract further provided that Byrne Brothers were to reimburse the Ballast Company for any expenditures it might make in connection with the work, and also that Seip was to receive from Byrne Brothers one dollar per lineal foot of sewer for his services in connection with the financing of the contract. Seip testified that this contract between him and Byrne Brothers was never formally

assigned to the Ballast Company; that he was the head of the Ballast Company and ran it in his own way; that this contract with the Byrne Brothers was considered that of the Ballast Company and not his personal contract; that there was never any question of the fact that the dollar per lineal foot provided for in the contract was to go to the Ballast Company and not to him personally. He further testified that the Byrnes had not been in business very long at this time and it was a question of their needing financing and "this contract was more a matter of our financing it than anything else"; that Byrne Brothers borrowed money from the Roseland State Bank from time to time; that his connection with the bank and the fact that the Ballast Company was financing this job had something to do with the bank advancing them credit.

In answer to the proposals of the Sanitary District for bids on this contract, four contractors submitted bids, one of which was the Ballast Company. In submitting the bid of this company, Seip, as its president and managing officer, made an affidavit to the effect that its proposal was made "without reference or regard to any other proposal or proposals and without agreement, understanding or combination, either directly or indirectly, with any other person or persons with reference to such bidding in any way or manner whatsoever."

The work to be done under this contract involved the construction of 7,380 lineal feet of 6-foot 6-inch concrete sewer and 14,780 lineal feet of 4-foot 6-inch concrete sewer. The proposal of the Sanitary District, upon which the bids were based, did not call for lump sum bids. Fourteen different items were specified, upon which bids were to be submitted. Item 1 covered the 6-foot 6-inch sewer and Item 3 covered the 4-foot 6-inch sewer. Of the other items, those which are necessary to note are Items 10, 11 and 14. Item 10 called for a bid on 100 cubic yards of "additional earth

272     APPELLATE COURTS OF ILLINOIS.

Peabody v. Sanitary Dist. of Chicago et al., 235 Ill. App. 265.

excavation in tunnel''; Item 11 called for a bid on 100 cubic yards of additional concrete; and Item 14 called for a bid on 50 thousand feet, board measure, of sheeting or timbering. It was stated in the instructions to bidders that this schedule of quantities was approximate only and was assumed only for the purpose of comparing bids. A number of borings taken by the Sanitary District along the line of the proposed sewer were indicated on the plans, and these showed hard blue clay in some instances and soft blue clay in others, at the level at which the sewer was to be built. The form of the contract to be entered into was submitted by the Sanitary District with the proposals and also 115 paragraphs of specifications.

As to Item 10, these specifications provided that the contractor, when so ordered by the engineer in writing, ''shall make any excavation other than rock excavation, in actual tunnel below and outside the lines of the heading which may be found necessary to complete the work covered by this contract.'' It was also provided by the specifications under Item 10 that for all additional excavation ''the unit price specified herein per cubic yard will be paid, which sum is agreed by the contractor to be full compensation for the cost of excavating outside of the line of the heading, for all materials in place to the lines and grades given by the engineer,'' with certain exceptions not necessary to note.

The specifications under Item 11 provided that the contractor was to furnish and place any additional concrete required which was to be paid for at the unit price per cubic yard specified under that item.

The specifications under Item 14 required that the ''contractor shall leave in place such timbering, sheeting and shoring as the engineer may order in writing'' and further that ''for all lumber used for timbering, sheeting and shoring which is left in place by order of the engineer, the unit price herein specified will be paid.''

Peabody v. Sanitary Dist. of Chicago et al., 235 Ill. App. 265.

Under Items 1 and 2, the specifications provided, in paragraph 72, that "the unit prices per lineal foot of sewer herein specified under Items 1 and 2 shall cover the cost of furnishing all labor, materials, tools, plant and appurtenances necessary for the work, and of constructing, maintaining and fully completing the work in every detail, as shown on the plans and herein specified, except where payment for collateral work over and above or in addition to said unit prices is herein specifically provided." A similar provision is to be found in paragraph 76 of the specifications, providing for payment.

Under the heading "Excavation-Tunnel," the specifications provided in paragraph 20, that "all excavation in tunnel which is required for the construction of the sewer and appurtenances as called for under Items 1 and 2 and also all excavation which is ordered under Item 10 shall be performed by the contractor in accordance with" certain detailed specifications not material to note here, "supplemented by the specifications for excavation, open cut, so far as the latter may apply." Under the specifications for excavation, open cut, which do seem to apply, in paragraph 9 it was provided that "it is expected that satisfactory material for foundation will be found at the elevations shown on the drawings, but in case the materials encountered are not suitable, or in case it is found desirable or necessary to go to an additional depth or width to provide proper bearing for the masonry, the excavation shall be carried to such additional depth and width as the engineer may direct. Additional depth of excavation so ordered, and concrete ordered for filling such additional excavation will be paid for at the respective unit prices herein specified for additional excavation and concrete."

The specifications provided further as follows in paragraph 23: "Tunnel excavation shall be trimmed to such size and shape as will allow the placing of

the full masonry section of the sewer as shown on the plans. If excavation is carried outside of or in excess of the specified neat outside dimensions of the section to accommodate timbering or otherwise * * * the space outside of the specified section shall be completely and solidly filled against the earth or timbering as the case may be, with concrete of the quality specified for the sewer section, at the cost of the contractor."

Paragraph 24 of the specifications read in part as follows: "All sheeting, bracing and other supports used in tunnel and shafts shall be left in place unless removed by permission of the engineer. * * * All sheeting, bracing or other timbering left in place by order of the engineer, as herein specified, will be paid for at the unit price specified for timbering under Item 14."

Following the specifications as they appeared in the proposals submitted by the Sanitary District were a number of articles or paragraphs of "general conditions" the seventh of which was to the effect that "the Sanitary District reserves the right to make any changes in the specifications and plans which may be deemed necessary either before or after beginning any work under this contract, * * * provided, that if alterations are made, the general character of the work as a whole is not changed thereby."

Section 72 of the specifications, in addition to the provisions already noted, provided that "all timbering and bracing used in tunnel shall be so placed as to allow the placing of the full masonry sewer sections to the lines, grades and dimensions shown on the plans."

The bid submitted by the Ballast Company was $80 per foot on Item 1; $73 per foot on Item 2; $23 per cubic foot on Item 10; $45 per cubic foot on Item 11; and $105 per thousand feet, board measure, on Item 14. This made a total of $590,400 for Item 1 and

$1,078,940 for Item 2, or a total of $1,669,340 for the building of the 22,160 feet of the sewer, disregarding the extra items. Although the bid as submitted by the Ballast Company was the lowest of the four bids submitted, the chief engineer of the Sanitary District held several conferences with Seip, following the submission of bids, as a result of which the Ballast Company reduced its bid on Item 1 to $70 per lineal foot, and on Item 2 to $56.53 per lineal foot, making a total reduction of $317,227 on those items, reducing the cost of the sewer, as based on the per foot price throughout, to $1,352,113. Seip testified as to these reductions that the engineer convinced him that the Ballast Company, in figuring its bids as originally submitted, had put in a figure for labor which was too high.

The contract was awarded to the Ballast Company on its revised bid, and was duly entered into by the district and the company late in November, 1921.

On January 20, 1922, the first shaft in the construction of the sewer was sunk to the sewer grade, where a soft blue clay was encountered, and on that day the chief engineer of the Sanitary District, one Dilling, wrote a letter to the Ballast Company to the effect that he had investigated the character of the soil through which the sewer was to be built and "it is essential for safety to timber the entire section. You are hereby authorized to substantially timber the tunnel in accordance with cross sections prepared by the assistant engineer in charge in the field and approved by me." The original drawings on this sewer, as prepared by the engineers of the district, showed a cross section of the sewer indicating no timbering left in place except where the sewer passed under certain railway rights of way. With the letter of January 20, the engineer of the district sent the Ballast Company additional drawings, showing cross sections of the two sizes of sewer, both of which showed tim-

bering of a substantial character, with concrete filling the voids between the outside of the sewer and the timbering. Each of these drawings specified the number of cubic yards of "Extra Excavation," the number of cubic yards of "Extra Concrete," and the number of feet, board measure, of "Extra Timbering" involved in the construction of the sewer according to these new drawings.

The record contains another letter from Dilling to the Ballast Company, under date of January 24, 1922, referring to the prior letter of January 20, and saying: "Your understanding that the timbering ordered therein is to be left in place is obviously correct, inasmuch as soil conditions being encountered on the job are such that it would be impossible to carry on and maintain the work without the timbering being left in place. Soil conditions encountered as against those apparently existing according to borings taken before the design was commenced subject the sewer to greater loads than those assumed in the design, but in my opinion the timbering left in place, together with the additional concrete necessary to complete the section, both as shown in sketch accompanying my letter of January 20, will strengthen the sewer sufficiently to provide for this increased load. All timber ordered left in place will be paid for in accordance with your contract under Item 14."

This letter of Dilling's of January 24, was sent by him in reply to one received by him from the Ballast Company under date of January 22, which acknowledged receipt of Dilling's first letter, of January 20, and in which the Ballast Company asked Dilling to let them know "if it is your order that said timber" (as specified in the new drawings) "is to be left in place and paid for according to our contract in addition to the additional excavation and concrete work ordered done according to your sketch mentioned."

Byrne Brothers did all the work under this con-

tract, as contemplated in the agreement entered into by them with Seip or the Ballast Company. Apparently, the vouchers issued included the cost of the timbering left in place according to the revised drawings, from the beginning, but did not include anything for extra excavation or extra concrete, the other two items mentioned on those drawings, and made necessary by the orders of Dilling to leave all timbering in place. The record contains a letter dated March 10, 1922, from the Ballast Company to Dilling, acknowledging receipt of "your estimate No. 1 for North Side Intercepting Sewer" and continuing to the effect that the Ballast Company had noticed "that it does not include payment under Items 10 and 11, for additional excavating and concrete work ordered done by you and shown on your sketch accompanying your letter of January 20th last." This letter concluded, "We wish that you would order your engineer in the field to include payment for such additional work, in all future vouchers." This "estimate" referred to in this letter covered the work done up to its date, which was March 8, 1922, and on it was based the first voucher, which was issued on that day, for $74,550.

In reply to the letter of March 10 from the Ballast Company, Dilling wrote that company under date of March 13, advising them that "before including in vouchers covering said work, payment for the additional excavation ordered to be removed and the additional concrete ordered to be placed in accordance with my letter of January 20, 1922, and the sketch accompanying it, although payment for such additional work is specifically provided for in your contract and unit prices therefor are fixed therein, I would like to lay the matter before the Committee on Engineering and secure its express authorization to make such payment, because of the large amount of money involved."

278    APPELLATE COURTS OF ILLINOIS.

Peabody v. Sanitary Dist. of Chicago et al., 235 Ill. App. 265.

Under date of April 3, 1922, the Ballast Company again wrote Dilling, "in regard to the construction of the sewer covered by the contract for the North Side Intercepting Sewer No. 1, on which additional excavation and concrete, as well as timbering, was ordered according to blue-print accompanying your letter of January 20, 1922," and complaint was made that Dilling was "still failing to include the payment for such additional excavation and concrete," and request was made that this matter "be settled as soon as possible and payment included in your next voucher as per our verbal understandings heretofore made."

Under date of May 18, 1922, Dilling wrote again to the Ballast Company, advising them that their demand that they be paid "for additional excavation and additional concrete necessary to complete the work as ordered was referred to the Board of Trustees at a meeting of the Committee on Engineering held May 4th. On that date the matter was referred to the Law Department for an opinion as to the liability of the District to pay for such additional work. Yesterday the Board of Trustees, at another meeting of the above Committee, considered and approved an opinion submitted by attorney Mulvihill, holding that the District is liable to pay for such additional work and authorized us to include in future vouchers the cost of the same. Therefore, in accordance with this direct authorization of the Board of Trustees, I shall include in future vouchers payment, based upon unit prices included in your contract, for any additional work which has been or may have to be done on account of changes in the sewer itself and the method of constructing it, made necessary by the nature of the soil encountered on the job."

There is testimony in the record by one of the district engineers to the effect that the soil conditions found when the first shaft was sunk were found to continue throughout the whole length of the sewer;

that the borings were not correct and the soil was found to be much softer than the borings indicated; that the field engineer of the district was on the job from day to day to see if the soil conditions changed as work proceeded, so that additional timbering and excavation could be stopped; that the soil was very soft and that in his opinion the extra timbering and excavating was necessary.

Apparently, along in June, 1922, the place was reached where work was to begin on the larger bore and on June 22, Dilling wrote the Ballast Company confirming a verbal order previously given, to the effect that they were "authorized to substantially timber the larger bore in accordance with the attached sketch, showing a cross section of the timbered sewer prepared by the assistant engineer in charge in the field and approved by me. All timber ordered left in place will be paid for in accordance with your contract under Item 14."

On the following day the Ballast Company wrote Dilling acknowledging receipt of his letter of June 22, ordering the larger bore "to be timbered together with additional excavating and concrete work to be done which timber we understand is to be left in place," and calling his attention to the fact that "your order does not say whether we are to leave said timber in place, we therefore ask you to write us giving us more explicit orders on this work."

Under date of June 26, Dilling wrote the Ballast Company, saying: "There has been no change in conditions encountered on the job which would justify an attempt to remove any part of the timber shown on the sketch accompanying my order of June 22nd before concreting the bore, and in my opinion such removal would endanger not only the work, but the lives of those engaged in its construction as well. You will therefore proceed to timber the bore substantially as shown by said sketch, the timber to be left in place

and paid for in accordance with your contract under Item 14. The timbering is to be substantially as shown, throughout the entire larger bore unless a change in conditions makes it safe to reduce the amount of timber placed or left in place, or both, in which case you will receive further orders. The additional excavation ordered to be removed and the additional concrete ordered to be placed in accordance with the sketch referred to above will be paid for under Items 10 and 11 of your contract, respectively, pursuant to the express authorization of the Committee on Engineering, dated May 17, 1922.'' The evidence shows that all committees of the Board of Trustees of the Sanitary District consisted of all members of the board.

The amounts paid to the Ballast Company under this contract under Items 10, 11 and 14, for the extra excavating, concreting and timbering involved by reason of the claimed change in plans as evidenced by the new drawings showing cross sections with the timber in place, aggregated $1,055,103.64. This money was paid to the Ballast Company in addition to the payments made under Items 1 and 2, which aggregated $1,352,113.

On October 18, 1922, the complainant filed his bill of complaint. The nature of the relief therein sought has already been described.

The complainant contended in the trial court that the purported contract between the Sanitary District and the Ballast Company should be declared invalid, or that, even if it be considered valid, by reason of overpayments under it an accounting should be ordered to determine the value of the work done on the North Side Intercepting Sewer, such accounting to be the basis for a decree determining what further payments, if any, should be made to the Ballast Company, or what restitution, if any, should be made by that company. It appears from the briefs filed in this

court that after the complainant's bill was dismissed for want of equity in the trial court, the Sanitary District paid the Ballast Company the full balance remaining due under the contract, amounting to $501,398.94, the work having been completed pending the hearing in the trial court, the district withholding from the total amount claimed by the Ballast Company to be due under the contract the sum of $20,-790.08, to cover a claim for lien which had been filed by a surety company.

In view of these changed conditions, the complainant urges in this court that an accounting be ordered between the parties and that the Ballast Company be required to restore all payments and amounts held to have been unauthorized under the contract, assuming it to be a valid contract, or, if the contract is held to be void, that the Ballast Company be required to restore all payments made to it over and above what it can show it is entitled to receive, for all work actually done, on the basis of a *quantum meruit*.

In support of his appeal the complainant urges the following points:

1. The Ballast Company was not a responsible bidder, having no plant or equipment with which to do the work.

2. The bid was collusive, the Ballast Company, without equipment and not intending to do the work, obtaining the contract in its own name, expecting and intending to make a profit on it and have the work done by Byrne Brothers, whose opportunities for doing the work were not as good as those of the Ballast Company.

3. The proposal submitted to bidders by the Sanitary District was too indefinite to serve as a basis for competitive bidding. This point is based largely on the wording of section 24 of the specifications, to which reference has already been made.

4. The directions of Dilling, ordering timbering to

be left in place, this involving additional excavating and concreting, as indicated on the so-called revised cross sections, did not amount to a change of plans authorizing the additional payments which were made under Items 10, 11 and 14. The original plans and specifications, when read together, required the contractor to do all the work called for by the revised cross sections, under Items 1 and 2.

5. Schmidt's confidential relationship to the Sanitary District as its treasurer and the financial adviser of its trustees, and the fact that he was, at the same time, vice president, director and a large stockholder in the Ballast Company, which was awarded the contract, and president of the Roseland State Bank, which financed the Byrne Brothers, who did the work under the contract, by agreement with the Ballast Company, is sufficient to require that the contract be declared void.

We shall consider these contentions in the order named.

1. In our opinion the situation presented by this suit at bar is not such as to involve the question of whether the Ballast Company was a responsible bidder, as it might have, if the bill had been filed before the contract had been let or before the work had been begun. At the time this bill was filed the work under this contract was all but 10 per cent completed. It is not contended that the work of building this sewer under this contract was not properly done. Pending the hearing in the trial court the work was completed. That being the situation, the question of whether the Ballast Company was a responsible bidder becomes a moot or academic question, and may not now be urged as a reason for declaring the contract void or avoiding the payments called for by its terms.

2. We are further of the opinion that the bid submitted by the Ballast Company may not reasonably be considered collusive, so as to render the contract

Peabody v. Sanitary Dist. of Chicago et al., 235 Ill. App. 265.

void. While the testimony shows that Byrne Brothers was considered by the Roseland State Bank as a financially responsible customer, the extent of its credit is not indicated. It appears from the evidence, without contradiction, that Byrne Brothers were not in a position to post the certified check for $150,000, which was required of each contractor submitting a bid; that their financial condition was such that they did not feel they were in a position to bid on this contract; that they had no intention of doing so; that Seip made no request or suggestion that they refrain from doing so and that they would not have done so even if no arrangement had been entered into with Seip. So far as the affidavit of Seip, made in connection with the bid of the Ballast Company, is concerned, it was merely to the effect that that bid was made without any agreement or understanding with any other person or persons "with reference to such bidding, in any way or manner whatsoever." In our opinion, the meaning of that affidavit must be taken to be that neither Seip nor the Ballast Company had entered into any agreement or understanding with anybody which would have the effect of interfering with free bidding or preventing anybody from bidding, so as to narrow the field or tend to make the contract figures higher than they might otherwise have been. Such is the plain indication of the first part of the affidavit, which precedes the language found in the latter part, to which complainant has urged our attention, in which Seip stated that he had "not directly or indirectly entered into any combination, collusion, undertaking or agreement with any other bidder or bidders to maintain the price of any contract or work covered by said proposal, or to prevent any bidder or bidders from bidding or to induce any bidder or bidders to refrain from bidding on said contract or work and that said proposal" (bid) "so made is without reference or regard to any other pro-

posal or proposals." Then follows the part of the affidavit stressed by complainant, "and without agreement, understanding or combination, either directly or indirectly, with any other person or persons, with reference to such bidding in any way or manner whatsoever." In our opinion this latter part of the affidavit may not be so segregated from that which goes before it as to give it the meaning contended for. The whole of it must be read together and, when it is, the evident and plain meaning of it is that the affiant had done nothing to stifle bids or interfere with anyone who might otherwise have submitted a bid. So far as the evidence shows, the agreement entered into by Seip and the Byrne Brothers had no such effect on them.

3. As to the contention that the proposal submitted to the bidders by the Sanitary District was too indefinite to serve as a basis for competitive bidding, we are of the opinion that such contention is untenable. It is true that section 24 of the specifications, which formed a part of the proposal submitted by the Sanitary District on this contract, when segregated from all the other sections of the specifications, and read by itself, is not as clear as it might be. The record shows that under date of October 3, 1922, one Wisner, an engineer in the employ of the Sanitary District, who had been requested by one Ramey, who was then the acting chief engineer of the district, to inspect the work done under this contract and report on it, submitted his report in writing. It was on this report of Wisner's that the action of the complainant in filing this bill was based. In this report Wisner called attention to the wording of section 24 of the specifications under this contract, and gave it as his opinion that the meaning of the section was "that the contractor must furnish, without charge, the necessary timbering and leave it in place unless permitted to remove it by the engineer." In our opinion, that is not a reasonable interpretation of this section, espe-

cially when it is read together with many of the other provisions of the specifications. The only language in the section which tends to confusion is that to the effect that all timbering used in tunnel and shafts shall be left in place "unless removed by permission of the engineer." But that language is not at all in conflict with the last paragraph of the section to the effect that all timbering left in place "by order of the engineer as herein specified" will be paid for at the prices specified under Item 14. With that specific provision in the last paragraph, the previous sentence referred to may not, in our opinion, be considered as meaning that all timbering not removed by permission of the engineer shall be at the expense of the contractor. This becomes entirely clear when reference is had to a number of other provisions in the specifications, some of which have been quoted, which are plainly to the effect that all timbering left in place is to be paid for as specified under Item 14. If the contention of the complainant on this point were sound, the provisions of Item 14 and of the last paragraph of section 24 of the specifications would be meaningless, for all the engineer would have to do would be to withhold his consent to the removal of any timbering and thereby all of it would be left in place, but would not be paid for as specified in Item 14, and in the last paragraph of section 24.

In our opinion no significance is to be attached to the fact that as to Items 10, 11 and 14, the proposal of the Sanitary District asked for bids on 100 cubic yards of earth excavation, 100 cubic yards of additional concrete and fifty thousand feet, board measure, of sheeting or timbering. Those quantities were, of course, not the quantities contemplated in the execution of this contract. The specifications distinctly provided that these quantities were specified "solely" for the purpose of comparing bids.

4. We are further of the opinion that when the en-

gineer of the Sanitary District directed that the tunnel be timbered and that all timbering be left in place, and when he submitted to the contractor the so-called revised cross sections indicating that specified amounts of "extra excavation," "extra timbering" and "extra concrete" were involved, a change of plan was effected, as provided for in the paragraph of general provisions which has already been referred to and quoted. As we read the original contract, including the specifications and plans, it is our opinion that it was contemplated that the soil conditions, which it was expected would be encountered, would probably permit excavation only to the extent of the neat outside measurement of the sewer or to such an extent as to accommodate the forms which might be used to hold the concrete walls of the sewer in place until they set. Such is the indication conveyed by the original drawings. The evident meaning of section 23 of the specifications is as testified to by Ramey, and as set forth by him in writing in a communication sent by him as acting chief engineer to the attorney for the district, under date of November 3, 1922, which communication was introduced in evidence without objection. Ramey testified that the "specified neat outside dimensions of the section," as referred to in section 23, meant the neat outside line of the section as shown on the original drawings or plans. The neat outside dimensions for the section were specified on those plans. Under section 23, if the contractor chose to excavate outside those dimensions to accommodate his forms or timbering, then the space outside such neat outside measurement of the section was to be filled with concrete either against the earth, if forms or timbering were removed, or against the timbering if not, at the contractor's cost. But when the engineer sent the contractor the revised cross sections, while the neat outside measurement of the sewer itself was not changed, that of the section was. We

are of the opinion that the "section" as shown on these revised drawings clearly includes the sewer, the timbering to be left in place, and the additional concrete called for. That such was the intention of the Sanitary District and its engineers is evident from the fact that these revised drawings specified on their face the amounts of "extra excavation," "extra timbering" and "extra concrete," involved per foot in this revised plan of construction.

Two engineers testified that if they had been bidding on this contract, under the prescribed specifications in 1921, they would have bid figures for Items 1 and 2 which were not far from those represented by the revised bid of the Ballast Company on those items and that those figures would have included the doing of all the work which has been done under the contract and as contemplated or specified by the revised drawings. We are not much impressed by that testimony. These engineers were bidding after the fact, so to speak. Many of the items to be considered in making up bids permitted considerable legitimate latitude in honest and reasonable differences of opinion and judgment between engineers, including the question of a proper percentage of profit. These and other reasons make such opinion evidence of little real value.

Considered as a valid contract, we are of the opinion that all its various provisions, when considered together, were reasonably capable of the interpretation which was placed upon them by the trustees of the Sanitary District, Dilling, the chief engineer, and also by their attorney.

5. However, we are further of the opinion that the last contention made by the complainant must be upheld and that the contract must be held to be invalid, in view of the relationship of Schmidt to the Sanitary District, and to the successful bidder, the Ballast Company, because of the provisions of the statutes of our State.

Section 3, of chapter 102 (Cahill's Ill. St. ch. 102, ¶ 3) provides as follows:

"It shall not be lawful for any person, now or hereafter holding any office, either by election or appointment, under the Constitution of this State, to become in any manner interested, either directly or indirectly, in his own name or in the name of any other person or corporation, in any contract, or the performance of any work in the making or letting of which such officer may be called upon to act or vote * * * and any and all contracts made and procured in violation hereof, shall be null and void."

In our opinion, Schmidt, as the treasurer of the Sanitary District, was the holder of an office by appointment, within the meaning of this statute. This statute may not be given the narrow construction contended for by counsel for defendants and held to refer only to those holding an office created by the constitution of the State. It is sufficient answer to such contention to point out that there are no offices created by our constitution which are filled by appointment. The words "under the constitution" as found in this statute relate to all public officers who fall under the provisions of the State Constitution, whether the offices they occupy are created by the constitution itself or by other provision of law. That such is the proper interpretation of these words is indicated by the provisions of section 4 of the same Act (Cahill's Ill. St. ch. 102, ¶ 4), prescribing penalties in case of violation of the provisions of the Act, which section applies the penalties specified to "any person now or hereafter holding any office, either by election or appointment under the Constitution of this State, or any law now or hereafter in force in this State." The provisions of these two sections are in no way conflicting, in our opinion, but entirely consistent and in harmony with the meaning which we have indicated. This statute should be construed liberally, and so that its evident purpose may be carried out, if that may

reasonably be done, when occasion arises to apply it to a specific situation. In *Peabody v. Russel*, 301 Ill. 439, our Supreme Court said: "It is a canon of construction well recognized, not only in this court but in courts of other jurisdictions, as it relates to statutes, that the chief purpose is to give effect to the intention of the legislature. In seeking such intention courts are to consider the language used, the object to be attained or the evil to be remedied."

We are unable to agree with the contention of defendants, to the effect that the duties of Schmidt, in the office of treasurer of the Sanitary District, were entirely ministerial. Some of them, of course, were, as in the case of his duty to sign all checks and warrants, which had been duly approved, but he had other duties which were not ministerial in nature. He selected the depositaries for all the funds of the Sanitary District, and in this his discretion was absolute. Under the rules he was the financial adviser of the district and it was made his duty to "make such reports as are required." Such duties call for an exercise of judgment and discretion and are not merely ministerial in character. It is well admitted by the Ballast Company, in the answer filed by it in this case, that "Schmidt occupies a relation of trust and confidence to the Sanitary District of Chicago with respect to the execution of his duties as such treasurer."

The fact that the legislature, pursuant to its policy to forbid interest by public officers or servants in public contracts, has, in other statutes, such as the Cities and Villages Act (Cahill's Ill. St. ch. 24, ¶ 81), and the general Sanitary District Acts of 1911 (Cahill's Ill. St. ch. 42, ¶ 295) and of 1917 (Cahill's Ill. St. ch. 42, ¶ 318) laid down provisions somewhat broader than those found in the statute applicable to the situation presented in the case at bar, furnishes no reason why the latter should be given any narrower construction than if those broader statutes had not since

been passed. If anything, the later statutes referred to furnish a strong reason for giving the statute, which applies here, a liberal construction.

Much emphasis is placed by the defendants on the testimony in the record on the question of what Schmidt did and did not do in the making or letting of the Ballast Company's contract. The question to be considered, however, is not that, but rather, what he *might* have to do in the making or letting of such a contract. The statute does not prohibit any officer from having an interest in any contract, in the making or letting of which he *is* called upon to act or vote, but of which he "may be called upon to act or vote." That Schmidt could never be called upon to vote, in the making or letting of such a contract, is clear. The real question therefore, is, "may" he be called upon to "act * * * in the making or letting" of such a contract. In our opinion it is clear from the record that he may be called upon to so act, and in a capacity not merely ministerial in its nature.

It is admitted that Schmidt occupies a relation of trust and confidence to the Sanitary District as its treasurer. Under the rules of the board he is their financial adviser, and may be called upon by the board to "make such reports as are required." Further, under the rules, he had sole discretion in the selection of the depositaries of Sanitary District funds. To guard against any possible loss, by reason of poor judgment or an indiscreet selection in that regard, he was required to furnish the district with a bond in the sum of $3,000,000. No reason is perceived why, in the exercise of this discretion, which was his, he might not use the Roseland State Bank as one of the depositaries of the funds of the District. He was the president of that bank. Byrne Brothers were customers of the bank. The Ballast Company, of which Schmidt was vice president, director and a large stockholder, had contracted with Byrne Brothers to

Peabody v. Sanitary Dist. of Chicago et al., 235 Ill. App. 265.

the effect that if the Ballast Company secured the contract for the building of this sewer from the Sanitary. District, Byrne Brothers were to do the work and it was understood that they would be financed therein by the Roseland State Bank, through the influence of the Ballast Company. It will thus be seen that it was possible for Schmidt, as treasurer of the district, vice president of the Ballast Company and president of the bank, to make use of the funds of the district in financing Byrne Brothers. The testimony is that the contract between Seip, representing the Ballast Company, and Byrne Brothers was, in effect, one for the financing of Byrne Brothers in the doing of the work for which Byrne Brothers had the equipment and the Ballast Company had not. (Why such an arrangement was entered into with Byrne Brothers rather than the Illinois Improvement & Construction Company, which also had the equipment and in which Seip and Schmidt were also large owners, does not appear.) Schmidt handled the financial end of the business of the Ballast Company. It matters not that the testimony is that he did not personally attend to the making of the financial arrangement, which was entered into in this instance between the Ballast Company and Byrne Brothers, in our opinion.

In this situation, the Board of Trustees of the Sanitary District receives four bids on this contract, one of which is that of the Ballast Company. It is their duty to award the contract to the lowest *responsible* bidder. The lowest bidder is the Ballast Company, in which Schmidt, who occupies the office of treasurer, by the appointment of the Board of Trustees of the Sanitary District, is vice president, director and large owner. The question to be determined by the board is whether the Ballast Company is "responsible" not only from the engineering and contractual standpoint, but financially. For advice, as to the engineering and contractual responsibility of the lowest bidder, the

board will turn to its engineers. To whom "may" the board look for advice as to the financial responsibility of this bidder if not to their treasurer, occupying a position of confidence and trust as their financial adviser, who, under the rules, is required to make such reports as the board may call for? Again it matters not, in our opinion, that the evidence in the record indicates that in awarding this contract to the Ballast Company, the Board of Trustees of the Sanitary District had before it only the Ballast Company's bid, supplemented by the acquaintance of certain of the members of the board with Mr. Seip and with the financial responsibility of the Ballast Company, and the bids of other bidders and a report from Dilling, the engineer, that all four bidders were "responsible." We repeat, we are not concerned with the question of whether Schmidt *did* act in the making or letting of this contract, but rather the question of whether he *might* have been called upon to so act. In our opinion, the situation we have described clearly shows he might have been. If he had been called upon by the board to advise it as to the financial responsibility of the lowest bidder, the Ballast Company, either alone or in comparison with the other bidders, the possibility of such a division of interest being present in this confidential officer, and the capacity and power to serve his private interests at the expense of the public duties incident to his official position, is too clear for argument. It is equally clear, in our opinion, that the statute applicable here was designed to meet and to prevent just such possible situations. It is no answer to say that, in fact, such a situation was not presented in this case, nor that, if it had been, Schmidt would not have served his private interests at the expense of his public duties. We assume such to be the case. In such a case as this, a showing that a public officer has actually served his personal interests at the expense of his public duties,

or that there has been actual fraud, is not necessary to a decision that the contract made is void under the statute. *People v. Sperry*, 314 Ill. 205. The legislature realized that in situations such as that presented in the case at bar, a public official *may* abuse the confidential position he occupies and serve his private interests at the expense of his public duties, and they have accordingly wisely provided that *all* contracts made under such situations "shall not be lawful," and, without regard to whether the public official in a given case does or does not abuse his position, that "any and all contracts" in which even such a possibility is presented, "shall be null and void."

As was well pointed out by the Supreme Court of Maine, in replying to an official inquiry of the Governor of that State, as reported in 108 Me. 545, the court quoting from *Milford Borough v. Milford Water Co.*, 124 Pa. St. 610, 17 Atl. 185, this Act "is another and valuable safeguard thrown around municipalities. It was passed to protect the public from the frauds of their own servants and agents. It may be there was no fraud actual or intended in the present case, but the court will not allow it to be made an entering wedge to destroy the Act."

It being our conclusion that Schmidt "may be called upon to act" in the manner described, we are further of the opinion that such a possibility involves his "acting in the making or letting of" the contract, within the meaning of the prohibition contained in the statute. In our view, it may not reasonably be contended that one "may" not be "called upon to act * * * in the making or letting" of a contract by the Sanitary District, unless such possible act accomplishes the execution of the contract or definitely determines its making or letting. To so hold would be to narrow the prohibition of the statute to any interest on the part of an officer in a contract "in the making or letting of which such officer may be called

upon to   *   *   *   vote," eliminating entirely the words "act or" and giving them no effect. We are of the opinion that an officer "may be called upon to act * * * in the making or letting" of a contract, if he may be called upon to do such an act as may materially influence the decision as to whether or not the contract will be entered into. The acts which Schmidt "may" have been called upon to do in the situation involved here were such acts, and therefore within the prohibition of the statute. For that reason we have reached the conclusion that it must be held that the contract between the Ballast Company and the Sanitary District must be held to be null and void.

In contending that this contract is not rendered invalid under our statute, by reason of the relationship of Schmidt to the Sanitary District and to the Ballast Company, counsel for the defendants have called our attention to a number of cases which we have carefully examined and considered. It will not be necessary to refer to cases here, on the question of the distinction between judicial duties and those which are ministerial. That distinction is clear and well known. That Schmidt had a number of duties under the rules of the board, which involved an exercise of his judgment and discretion, we have tried to point out.

The case at bar may be clearly distinguished from the case of *In re Village of Kenmore,* 59 N. Y. Misc. 388, 110 N. Y. Supp. 1008. There, one Busch was the village treasurer and also the president of a company holding contracts with the village. The opinion does not disclose the extent of the duties which were his as the village treasurer. The law involved in that case provided that "an officer shall not be directly or indirectly interested in a contract which he or a board of which he is a member is authorized to make on behalf of the village." The court pointed out that

the treasurer was neither authorized to make the contracts there involved nor was he a member of the board of trustees which was so authorized. So far as this opinion shows, the treasurer there involved had no duties beyond those of a ministerial nature, and the law, applicable in that case, was not as broad in its terms as the statute we are concerned with here.

Our attention has been called to the case of *Baldwin v. Inhabitants of Prentiss,* 105 Me. 469, where the court, quoting from *Lovejoy v. Inhabitants of Foxcroft,* 91 Me. 367, says that a town treasurer "is unlike the cashier of a bank or the treasurer of a trading corporation. He is simply a public officer charged by law, * * * with the duty of receiving and guarding the public money, and disbursing it upon lawful warrant." Clearly that language cannot apply here, where it appears that the treasurer had duties prescribed by the rules of the district which were very much broader than those referred to in the case cited.

Reference is also made by counsel for the defendants to the case of *Beaudry v. Valdez,* 32 Cal. 269, in which the court holds that even if any official who might have acted or voted on a contract is only interested in his official position *in a ministerial way,* his relationship to both parties to the contract does not affect the validity of the contract. What we have already said will make it clear that that proposition cannot apply in the case at bar.

Inasmuch as we are of the opinion that Schmidt's relationship to both parties to the contract involved in this case comes within the prohibition of our statute, and thus renders the contract null and void, we shall not discuss the question of whether that relationship is in violation of the rules of the common law, which is considered and argued by the parties in their respective briefs.

For the reasons we have given, the decree of the superior court is reversed and the cause is remanded

to that court with directions to order an accounting in accordance with the prayer of the bill of complaint.

*Decree reversed and cause remanded with directions.*

MR. JUSTICE TAYLOR specially concurring: As it is assumed that no fraud in the transaction has been shown, the sole question here is, whether the treasurer being interested in the contract, the Sanitary District could legally make such a contract as the one in question? And the answer to that question depends upon whether Schmidt, the treasurer and financial adviser of the Sanitary District, was an officer under the constitution, and by reason of his official function might act in the making of the contract. If he was such an officer and might so act, then the contract in question was void *ab initio*.

Construing the statute in question, it is proper and necessary to bear in mind what the legislature undertook to accomplish and what inhibitions it sought to prescribe. The purpose and spirit of acts kindred to the one here applied is well stated by the late Mr. Justice Bailhache in *Lapish v. Braithwaite,* 93 L. J. Rep. 991, as follows: "It has been pointed out over and over again when cases of this sort have come before the courts that the legislature is anxious to insure entire purity of administration by local authorities and public bodies which have the power to demand public money and the control and management of it."

As the statute uses the words "act in the making," it would seem to mean to take part in those circumstances which lead ultimately to the finished contract. Making is a process, and certainly the treasurer and financial adviser might act and take part in that process. To say that because he could not vote or affix a final signature he might not "act in the making" would seem to be straining to repudiate the statute. In view of the purpose of the statute, that ought not to be done.

As, therefore, in my judgment, the treasurer was

an officer under the constitution and was in such a position that he might act in the making of the contract in question, and, yet, at the same time was interested in the contract, the statute makes the alleged contract a nullity.

MR. PRESIDING JUSTICE O'CONNOR dissenting: In my opinion the contract entered into for the construction of the sewer, between the Sanitary District of Chicago and the Illinois Improvement and Ballast Company, is not rendered invalid or void by virtue of section 3 of chapter 102, of Cahill's Statutes, on the ground that Schmidt, the treasurer of the Sanitary District, was an officer and stockholder of the Improvement Company. That section, which was enacted in 1872, provides that: "It shall not be lawful for any person, now or hereafter holding any office, either by election or appointment  *  *  *  to become in any manner interested, either directly or indirectly, in his own name or in the name of any other person or corporation, in any contract, or the performance of any work in the making or letting of which such officer may be called upon to act or vote.  *  *  *  And any and all contracts made and procured in violation hereof, shall be null and void."

It will be noticed that the provision of the section above quoted renders those contracts invalid and void only where the public official may vote or act in the making or letting of any contract in which he is interested. The Act does not prohibit a public official from being interested in any public contract, but only in those public contracts in which he may be called upon to act or vote in his official capacity. There are many public contracts entered into in this State, which, under the law, can only be accomplished by the public official voting. Another class of public contracts, the law provides, shall be executed merely by the act of the proper public officials. And the statute under consideration was aimed at both classes of

contracts, but only prevented those public officials from being interested in public contracts where they might vote or act in the making or letting of the contract.

In the instant case, the affairs of the Sanitary District of Chicago are conducted by its board of trustees, sec. 4, ch. 42, of the Act of May 29, 1889, Cahill's Ill. St. ¶ 340, so that its contracts are authorized to be made only by the trustees. Schmidt, as treasurer, could not vote or act in the making or letting of a contract. The most that he could do, under any circumstance, would be to advise or give information to the trustees. There is no conceivable way that he could vote or act in the making or letting of a contract on behalf of the Sanitary District. He was the treasurer of the district, appointed by the trustees, and the rules of that body made him the financial adviser of that board, but anything that he might do in reference to any contract could not be so construed as to be within the provision of the section in question. No officer of the State of Illinois and no officer of any city or other municipality is prohibited from entering into contracts with the Sanitary District of Chicago, by virtue of that section, except only the trustees of the Sanitary District itself. As Judge Pound said *In re Village of Kenmore,* 59 N. Y. Misc. 388, 110 N. Y. Supp. 1008, "I am of the opinion that the action of the board of trustees  *  *  *  has legal sanction, and that the law, rather than the trustees, should be the subject of adverse criticism in this connection." Of course, the law should not permit a person occupying the position of treasurer of the Sanitary District of Chicago to be interested in a construction company which was constructing a sewer for the district, but this is a question for the legislature.

In my opinion, what I have said finds support in other enactments of the legislature. Paragraph 36, ch. 24, Cahill's Stat. provides that no alderman of

any city shall be directly or indirectly interested in any contract to which the city is a party. And in 1911 and again in 1917, the legislature passed two acts in reference to Sanitary Districts, and in each of them it is provided that "no trustee or employee of such district shall be directly or indirectly interested in any contract" of the district. Paragraphs 295, 318, ch. 42, Cahill's Stat. It will be noticed that these sections do not limit the invalidity of contracts to those in which the alderman, trustee or employee may be called upon to vote or act. There is no such qualification, but, on the contrary, all aldermen, all trustees, and even all employees under the two latter Acts are barred from being interested in any contract with the municipality.